UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | Case No.: |
| Plaintiff, | ECF CASE |
| v. | **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** |
| TECHNICAL TRADING TEAM, LLC, EDWIN M. CARRION and JASON F. RODRIGUEZ, | |
| Defendants. | **JURY DEMAND** |

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and

through its attorneys, alleges as follows:

## I.    SUMMARY

1.      From at least January 2020 through the present (the "Relevant Period"), Edwin M.

Carrion, individually and as agent of Technical Trading Team LLC ("TTT"), and Jason F.

Rodriguez, individually and as agent of TTT, and TTT (collectively, "Defendants"), operated a

fraudulent scheme in which Defendants solicited, accepted, and misappropriated funds for a

pooled investment (the "TTT Pool") in, among other things, leveraged or margined foreign

currency exchange ("retail forex") contracts.

2.      Carrion, as Chief Executive Officer and agent of TTT, and Rodriguez as Chief

Operating Officer and agent of TTT, knowingly or recklessly made fraudulent and material

misrepresentations and omissions, in both conversations and written communications, about

TTT's retail forex trading strategy, their experience and track record as investment managers,

and the security and risk management of investing in the TTT Pool.  Defendants collectively

persuaded approximately twenty-seven individuals to invest at least $5 million in the TTT Pool. Investments were made in the form of loans by participants in the TTT Pool to TTT, memorialized in promissory notes, for which TTT promised to make monthly interest payments ranging from 1.5 to 2%, or 18 to 24% annual interest.

3.      To entice prospective pool participants, Defendants Carrion and Rodriguez—and TTT through Carrion and Rodriguez—knowingly or recklessly made materially false or misleading statements and omissions, that, among other things: Defendants offered the ability to participate in a high-yield loan program backed by a retail forex trading fund that could support interest payments of 18 to 24% annualized interest; Defendants would maintain a reserve fund to keep the principal of the pool participants' loans to the TTT Pool from being put at excessive risk; Defendants' investment strategy was to risk 1% of the TTT Pool with the goal of returning 3% profit; Defendants would not hold positions overnight, thus keeping the TTT Pool liquid; participants' loans were secured by TTT's assets, including real estate, that would not be invested and thus could serve as collateral; and Defendants had an extensive and successful track record investing in retail forex and digital assets.

4.      The statements and omissions were materially false or misleading, and induced pool participants and potential participants to invest their money with TTT.

5.      Defendants knew or were reckless in not knowing that their retail forex trading could not sustain their promises to pool participants to pay fixed rates of return of 18 to 24%. Indeed, Defendants were unsuccessful in their efforts to trade retail forex.  From April 2020 through October 2022, Defendants lost over $3.13 million of pool participants' money trading retail forex on a leveraged basis.  Moreover, Defendants misappropriated participant funds for

personal use and, as a result of their unprofitable trading, used new participants' funds to make interest payments to existing participants.

6.      On or about October 11, 2022, Defendants notified certain pool participants that TTT had defaulted on participants' loans and that TTT would no longer be making interest or principal payments due under the participants' promissory notes.

7.      By virtue of this conduct and the conduct further described below, Defendants have engaged, are engaging, or are about to engage in acts and practices in violation of Sections 6(c)(1), 4b(a)(2)(A)–(C), and 4*o*(1)(A)–(B) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 9(1), 6b(a)(2)(A)–(C), 6*o*(1)(A)–(B), and Commission Regulations ("Regulation") 180.1(a)(1)–(3) and 5.2(b)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) 17 C.F.R. § 5.2(b)(1)–(3) (2022), which prohibit fraud, and fraud in connection with retail forex transactions and by a commodity pool operator ("CPO").

8.      In addition to the above-described fraudulent conduct, Defendant Technical Trading Team acted at all times during the Relevant Period as a CPO by operating or soliciting funds for a retail forex pool that did not qualify as an eligible contract participant ("ECP") and was marketed to pool participants who were also not ECPs, and engaged in retail forex transactions, without being registered with the Commission as a CPO, in violation of Sections 2(c)(2)(C)(iii)(I)(cc) and 4m(1) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2022).

9.      Further, Defendants Carrion and Rodriguez solicited funds from pool participants for the purpose of trading in leveraged or margined retail forex contracts in accounts pooled with other participants, while associated with Defendant Technical Trading Team as an officer, employee, or agent, without being registered with the Commission as an associated person

("AP") of Technical Trading Team, in violation of Sections 2(c)(2)(C)(iii)(I)(cc) and 4k(2) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2), and Regulations 3.12(a) and 5.3(a)(2)(ii), 17 C.F.R. §§ 3.12(a), 5.3(a)(2)(ii) (2022).

10.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act and the Regulations promulgated thereunder.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other and further relief as the Court may deem necessary or appropriate.

11.     Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendants will continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as described below.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c of the Act, 7 U.S.C. § 13a-1, provides that the U.S. district courts have jurisdiction to hear actions brought by the Commission for injunctive relief or to enforce compliance with the Act whenever it shall appear to the Commission that a person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder.

13.     The CFTC has jurisdiction over the Defendants' solicitations of pool participants for the purposes of participating in a commodity interest pool and trading the leveraged retail forex transactions at issue in this case pursuant to Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C).  In addition, 7 U.S.C. § 2(c)(2)(C)(vii) provides: "This Act applies to, and the Commission shall have jurisdiction over, an account or pooled investment vehicle that is offered for the purpose of trading, or that trades, any agreement, contract, or transaction in foreign currency described in clause (i)."

14.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because one Defendant resides in this District, Defendants transact or transacted business in this District, and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District.  Additionally, some of the defrauded pool participants reside in and were solicited in this District.

### III.     THE PARTIES

15.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the responsibility of administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1–26, and the Commission's Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2022).

16.     Defendant **Technical Trading Team, LLC** was incorporated in Florida on or about April 2, 2020.  During the Relevant Period, TTT's address was listed as 19305 SW 79th Court, Miami, Florida 33157.  TTT has never been registered with the Commission in any capacity.

17.     Defendant **Edwin M. Carrion** was a resident of Pinecrest, Florida during the Relevant Period.  Carrion is the CEO and President of Defendant Technical Trading Team, LLC.

Carrion has never been registered with the Commission in any capacity.  On information and belief, Carrion changed his residency to Colombia in or around May 2023.

18.     Defendant **Jason F. Rodriguez** is a resident of Bellerose, New York.  Rodriguez is the COO, and an authorized member, of Defendant Technical Trading Team, LLC.  Rodriguez has never been registered with the Commission in any capacity.

## IV.     STATUTORY AND REGULATORY BACKGROUND

19.     Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C), and in particular 7 U.S.C. § 2(c)(2)(C)(i)(I), encompasses, subject to certain exceptions that do not apply here, agreements, contracts, or transactions in retail forex that are:  (i) offered to, or entered into with, a person that is not an ECP; and (ii) offered, or entered into, on a leveraged or margined basis, or financed by the offeror or counterparty, or by a person acting in concert with the offeror or counterparty.  Section 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii), provides that the Commission also has jurisdiction over an account or pooled investment vehicles offered for the purpose of trading, or that trades, retail forex described in 7 U.S.C. § 2(c)(2)(C)(i) above.

20.     With certain exceptions not relevant here, Section § 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), makes such retail forex agreements, contracts or transactions "subject to" Sections 4b, 4*o*, and 6(c) of the Act, 7 U.S.C. §§ 6b, 6*o*, 9, among others.  Section 2(c)(2)(C)(iv), 7 U.S.C. § 2(c)(2)(C)(iv), states that 7 U.S.C. § 6b applies to retail forex agreements, contracts, or transactions "as if" they were contracts of sale of a commodity for future delivery.

21.     Section 2(c)(2)(C)(iii)(I)(cc), 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc), prohibits any person from operating or soliciting funds, securities, or property for any pooled investment vehicle that is not an ECP in connection with agreements, contracts, or transactions in retail

forex, unless registered with the Commission, with certain exceptions not applicable to Defendants.

22.     Section 1a(11) of the Act, 7 U.S.C. § 1a(11), defines a CPO, in part, as any person:

> (i)  [E]ngaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—
>
>                          *   *   *   *
>
> (II) agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title[.]

23.     Section 1a(18)(A)(iv) and (xi) of the Act, 7 U.S.C. § 1a(18)(A)(iv), (xi), defines an ECP, in relevant parts, as:

> [A] commodity pool that—(I) has total assets exceeding $5,000,000; and (II) is formed or operated by a person subject to regulation under [the Act], provided that for purposes of Section 2(c)(2)(C)(vii) of [the Act], the term "eligible contract participant" shall not include a commodity pool in which any participant is not otherwise an eligible contract participant, *see* 7 U.S.C. § 1a(18)(iv); . . . or
>
> [A]n individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of—(I) $10,000,000; or (II) $5,000,000 and who enters into the agreement, contract, or transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.

24.     Regulation 5.25 provides that Sections 4b, 4k, 4m, and 4*o* of the Act, among others, "shall apply to retail forex transactions that are subject to the requirements" of Part 5 governing off-exchange foreign currency transactions, "as though such provisions were set forth

herein and included specific references to retail forex transactions and the persons defined in [Regulation] 5.1."  17 C.F.R. § 5.25 (2022).

25.     Section 4m(1) of the Act, 7 U.S.C. § 6m(1), and Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2022), require any person acting as a Commodity Pool Operator, as defined in Section 1a(11) of the Act and Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2022), respectively, to be registered as a CPO with the Commission.

26.     For the purposes of applying Part 5 of the Regulations, 17 C.F.R. pt. 5 (2022), a CPO is defined in 17 C.F.R. § 5.1(d)(1) as "any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an [ECP] as defined in section 1a(18) of the Act, and that engages in retail forex transactions."

27.     Section 4k of the Act, 7 U.S.C. § 6k(2), and Regulation 5.3(a)(2)(ii), 17 C.F.R. § 5.3(a)(2)(ii) (2022), require any Associated Person[1] of a CPO, as defined in Section 1a(11) of the Act and Regulations 1.3 and 5.1(d)(2), 17 C.F.R. §§ 1.3, 5.1(d)(2) (2022), respectively, to be registered as such with the Commission.  Regulation 3.12(a) makes it unlawful for a person to be associated with a CPO without being registered with the Commission.  17 C.F.R. § 3.12(a) (2022).

28.     For the purposes of applying 17 C.F.R. pt. 5, an AP of a CPO is defined in 17 C.F.R. § 5.1(d)(2) as "any natural person associated with a commodity pool operator . . . as a partner, officer, employee, consultant or agent . . . in any capacity which involves:  (i) The solicitation of funds, securities, or property for a participation in a pooled investment vehicle; or (ii) The supervision of any person or persons so engaged."

---

[1] *See* 17 C.F.R. § 1.3 (defining "associated person" as used in the CEA, as "any natural person who is associated … with … [a] commodity pool operator as a partner, officer, employee, consultant, or agent … in any capacity which involves (i) the solicitation of funds, securities, or property for participation in a commodity pool or (ii) the supervision of any person or persons so engaged.").

## V.    FACTS

### A.    Overview of Defendants' Fraudulent Scheme

29.    During the Relevant Period, Defendants Rodriguez and Carrion fraudulently solicited at least $5 million from approximately twenty-seven pool participants, who were in reality non-ECP pool participants, for the purpose of trading leveraged or margined retail forex contracts on their behalf in a commodity pool that was not itself an ECP.

30.    During this period, Carrion acted as the Chief Executive, President, and member of TTT.  Defendant Rodriguez acted as the Chief Operating Officer of TTT, and was responsible for trading the assets of the TTT Pool.

31.    Defendants pitched the TTT Pool to pool participants and potential participants as a high-yield private loan program backed by trading in retail forex on a leveraged basis, in addition to occasionally trading of digital assets, stocks, and other commodities such as gold. Defendant Rodriguez explained to pool participants and potential participants that his strategy was to risk 1% of the principal of the TTT Pool in order to make a 3% profit by using leverage.

32.    Because TTT would only be putting 1% of the TTT Pool at risk on a given trade, according to Defendants Carrion and Rodriguez the corpus of the investments would not be at risk.  Defendant Rodriguez explained that TTT would maintain a "reserve fund" consisting of the bulk of the TTT Pool's assets so that TTT would be able to return the principal of pool participants' loans when the loans matured at the end of their one-year terms.

33.    Defendant Rodriguez further told pool participants and potential participants that TTT's trading strategy involved only intra-day trading and that the TTT Pool would not hold positions overnight.

34.    Investments by pool participants in the TTT Pool were styled as debt.  TTT and participants would sign a promissory note for each investment, under which TTT would pay

participants between 18% and 24% annual interest on their loan, split into monthly payments. The promissory notes specified a loan term of one year, at the end of which the loan would mature and TTT would owe the pool participant the full amount of their loan principal.

35.     As security for these purported loans, TTT pledged all of its assets.  At various times, Defendants Rodriguez and Carrion told pool participants and potential participants that TTT owned real estate or that it held at least $10 million in a brokerage account.

36.     Along with the promissory note, Defendants also signed a Guaranty and Suretyship Agreement ("Guaranty"), which, at various times, contained a confession of judgment under which Defendants waived all rights to contest pool participants' claims to the return of their principal in the event of TTT's default on the monthly interest payments.

37.     Pool participants were instructed to send their funds for investment in the TTT Pool by wire to the Technical Trading Team bank account at Bank-1 (the "TTT Bank Account").

38.     According to bank documentation, the TTT Bank Account was opened on or about April 23, 2020, by Defendant Carrion, and both Defendant Carrion and Defendant Rodriguez were signatories to the account as authorized members of TTT.

39.     To conduct trading, Defendants would wire funds from the TTT Bank Account to one of two additional accounts.  First, TTT held a brokerage account at a retail foreign exchange dealer ("RFED") registered with the Commission (the "TTT Brokerage Account") for purposes of trading leveraged or margined forex.

40.     The TTT Brokerage Account was opened on or about April 14, 2020.  Both Defendant Carrion and Defendant Rodriguez were listed on the account opening paperwork as members of TTT, and as signatories on the account.

41.     Defendants wrote on the account opening paperwork, which sought to open a margin trading account, that the "source of funds that will be deposited in the account" was "earnings, savings, and investments."

42.     During the account opening process, a representative of TTT Brokerage Account asked Defendant Carrion, via email, to "confirm (Yes or No) whether or not Technical Trading Team, LLC solicits, accepts or invests third party funds."  Defendant Carrion falsely responded "No."

43.     In response to a question in the account opening paperwork whether TTT was a "pooled asset Entity," Defendants checked the box, "no."  The response was materially false or misleading.

44.     As an RFED, the financial institution where TTT opened the TTT Brokerage Account is required to maintain "[w]ritten policies, procedures, or systems concerning [the RFED's] . . . internal controls with respect to market risk, credit risk, and other risks created by [its] trading activities."  17 C.F.R. § 5.10(a)(1)(ii)(C) (2022).  By falsely representing the nature of the TTT Pool, TTT caused the RFED to be unable to properly manage the risk of taking on TTT as a customer.

45.     Further the RFED is required to not "carry a forex account for, accept a forex order or account from, handle a forex transaction for or on behalf of . . . any non-Member of the [National Futures Association ('NFA')] . . . that is required to be registered with the Commission as a[ ] . . . CPO."  NFA Rule 2-36(d) (2020); *see also* NFA Bylaw 1101(a) (2016) ("No Member may carry an account, accept an order or handle a transaction in commodity futures contracts for or on behalf of any non-Member of NFA . . . that is required to be registered with the Commission as a[ ] . . . CPO . . . and that is acting in respect to the account, order or transaction

for . . . a commodity pool or participant therein . . . ."). Because TTT was an unregistered CPO, the RFED was violating NFA regulations by allowing TTT to transact retail forex transactions through its business.

46.     By falsely representing that TTT was not a pooled asset entity and did not solicit, accept, and invest third-party funds, TTT caused the RFED at which it opened the TTT Brokerage Account to violate its compliance obligations under Commission and NFA regulations.

47.     Second, TTT also held an account at an offshore brokerage located in Belize that allowed trading of leveraged or margined retail forex but accepted deposits only in the form of digital assets (the "TTT Offshore Account"). To deposit participant funds at the TTT Offshore Account, Defendants wired participant funds to a digital asset wallet held at a domestic digital asset trading platform (the "TTT Wallet"). Defendants would then purchase bitcoin on the trading platform and transfer the bitcoin to the Belize-based TTT Offshore Account, which would credit the TTT Offshore Account with an approximately equivalent amount of U.S. dollars.

48.     The TTT Wallet was opened on or about July 9, 2020. Both Defendant Carrion and Defendant Rodriguez were listed as "representatives" of TTT for the account with signatory power over the account.

49.     During the process of opening the TTT Wallet, the domestic digital asset trading platform asked Defendants for details regarding TTT and the source of the funds that would be deposited. Defendant Carrion replied, "[W]e are a partnership that trades forex and stocks. We do not have customers we trade for us only. [The funds were acquired] thru our own capital via our other business such as a transportation company and real estate. [Our company is] just

trading for us private money we do not offer any services."  When asked whether TTT "intend[s] to act on behalf of others," Defendants responded, "NO."

50.     The TTT Offshore Account was opened on or about July 7, 2020, by Defendant Carrion, and both Defendant Carrion and Rodriguez were listed as signatories to the account.  On account opening paperwork, Defendant Carrion was listed as CEO of TTT and Defendant Rodriguez was listed as COO.

51.     During the process of opening the TTT Offshore Account, Defendants represented to the offshore brokerage that the "source of funds" for the account would be: "Income from real estate and other investments."

52.     Based on Defendants' false or misleading representations to pool participants and potential participants, approximately twenty-seven participants wired roughly $5 million to TTT with the expectation that TTT would invest the money in leveraged or margined retail forex contracts and that participants would receive a steady return in the form of monthly interest payments, with the backing of TTT's assets as collateral.

53.     Upon information and belief, however, TTT had no significant assets outside of the loans received from pool participants, and TTT never held any real estate.

54.     Further, TTT repeatedly invested more than 1% of the participants' funds to make retail forex and digital asset trades, and failed to maintain a reserve fund sufficient to return pool participants' principal.

55.     For example, on January 13, 2021 at 6:38 AM, TTT, directed by Defendant Rodriguez, entered a trade in the TTT Brokerage Account between the Euro/U.S. Dollar currency pair ("EUR/USD").  To enter the trade, TTT purchased a notional amount of

€1,000,000 at an exchange rate of $1.2168 per €1.  The premium required for this trade was only €22,000, equivalent to $26,769.60 using that same exchange rate.

56.     At the time TTT entered this trade, TTT held only $922,548.03 total among its various bank and brokerage accounts, so the premium of approximately $26,769 comprised approximately 2.9% of TTT's assets at the time the trade was entered.  In other words, TTT's combined assets would have needed to be at least $2,676,960—nearly three times its actual holdings—in order for the trade's required margin to represent 1% or less of that figure.  Thus, the initial margin that TTT paid to enter the trade on its own was greater than 1% of TTT's total assets at the time.

57.     Moreover, because TTT was trading on leverage, the risk that TTT took on by entering that trade far exceeded the amount it paid up front to enter it.  The RFED that operated the TTT Brokerage Account demanded that TTT post margin of only 2.2% of the notional value of a retail forex trade, meaning that TTT had a relatively small capital buffer before facing the possibility of losses far in excess of its initial margin.  For example, on or about February 15, 2021, TTT entered a trade in the TTT Brokerage Account to sell on margin £1,000,000 notional in the British Pound/Japanese Yen ("GBP/JPY") currency pair at an exchange rate of ¥147 per £1.  At the time TTT entered the trade, TTT had to pay £22,000, or an equivalent of $30,518.  In and of itself, that represented 2.54% of TTT's assets at the time—well above the 1% threshold.

58.     When TTT closed out the trade, however, the exchange rate had moved to ¥166.298 per £1, and TTT realized a loss of $151,633.77, a loss of 12.61% of TTT's total assets at the time the trade had been entered.  Thus, not only did TTT invest more than 1% of its assets in this trade, the trade ultimately lost five times as much as the initial margin TTT had paid to enter the trade, an inherent risk of entering trades using leverage or margin.

59.     Furthermore, TTT's balance of total assets after closing out this trade was approximately $1.04 million, significantly less than the approximately $4.3 million received from pool participants and still outstanding at the time.  Thus, contrary to Defendants' representations to pool participants, upon information and belief TTT was not maintaining a reserve fund equal to pool participants' contributions for the purpose of being able to return the participants' funds upon maturity of their investments.

60.     Upon information and belief, TTT did not control a bank or brokerage account that could be described as a "reserve fund" at all.  The TTT Account was used to receive pool participants' wires, transfer funds to the TTT Brokerage Account or Wallet, and send out interest payments, which often had to be funded by withdrawals from the TTT Brokerage or Offshore Account.  The TTT Brokerage and Offshore Accounts themselves were used for trading leveraged retail forex, not as a reserve, and even if they were "reserves," TTT lost millions of dollars trading in those accounts.  And the TTT Wallet was used as a conduit to the TTT Offshore Account, not a reserve.  Representations as to the mere existence of a "reserve fund" were false or misleading.

61.     Defendants also regularly held positions for months at a time, contrary to their representations that trades would be closed out within a single day, and not held overnight.

62.     For example, after TTT entered that same GBP/JPY trade on or about February 15, 2021, TTT held this trade open until April 18, 2022, for approximately 14 months, before closing it out at a six-figure loss.

63.     Statements of the TTT Brokerage Account show that on multiple occasions, retail forex trading positions were held at least overnight, if not much longer.  Thus, TTT's investment

strategy did not allow for the level of liquidity that Defendants promised pool participants they would have.

64.     On or about October 11, 2022, Defendants emailed certain of the pool participants to inform them that, due to trading losses, Defendants would not be able to provide the pool participants' promised monthly payments and would not be able to return the pool participants' principal.

65.     Additional pool participants received similar default notices in or about February 2023.  These pool participants were told by Defendant Carrion that TTT would be unable to make further interest payments because TTT's assets had been frozen by court order in connection with an investigation by the Securities and Exchange Commission ("SEC").  However, no such court order or SEC investigation existed at the time.

66.     To date, Defendants have not made any interest payments to pool participants after sending notices of default, nor have Defendants returned the principal of any participant's loan that has matured since TTT defaulted.

**B.     Defendants' Fraudulent Solicitation of Pool Participants**

67.     Defendants made materially false or misleading statements and omissions described above in person, and in various written forms, including emails, text messages, and in documents.

> *a.     Misrepresentations and Omissions About Experience, Track Record and Registration Status*

68.     Defendant Rodriguez often falsely touted his investment experience to potential pool participants.  For example, he told Participant-1 that he quit the police force because he was making so much money trading retail forex that he could afford not to work a salaried job.  In

fact, Participant-1 later learned that Defendant Rodriguez had been dismissed from the police force for disciplinary reasons.

69.     Defendant Rodriguez also showed Participant-1 a screenshot of his brokerage account showing a balance of over $10 million.  Defendant Rodriguez texted this same screenshot to Participant-2 on or about February 10, 2022, in response to questions from Participant-2 about the security of a potential reserve fund.

70.     When soliciting Participant-2 to invest in the TTT Pool, Defendant Rodriguez also told Participant-2 that if TTT "were to stop trading today, we would still have enough money in reserve to pay you and all the other investors their interest and principal for the next 3 years."

71.     On information and belief, Defendant Rodriguez never held or controlled a brokerage or bank account with that amount of money.  Moreover, upon information and belief, the screenshot Rodriguez showed to Participants was actually of a brokerage program that offers a "demonstration" mode that allows users to practice simulated trading by entering transactions at market prices without using real money.

72.     Indeed, according to Participant-3 Rodriguez often showed that he was having success trading retail forex by showing Participant-3 profitable trades that he had simulated using his "demo" account.  Rodriguez told Participant-3 that he started TTT with Carrion on the basis of this trading and that Carrion would be responsible for controlling the company and Rodriguez would be responsible for trading.

73.     For example, on or about November 16, 2021, Defendant Rodriguez texted Participant-2, "Another 3% up 6.2% for the week.  For any investor that needs to see how I dominate the market based off of a strategy tested over 12 years."

74. Records of TTT Brokerage Account show, however, that TTT did not close out any positions in the week prior to November 16, 2021. Further, the TTT Brokerage Account's mark-to-market position in the week prior to the text message dropped from a net loss of approximately $388,000 on November 8, 2021, to a net loss of approximately $420,500 on November 16, 2021.

75. Moreover, Carrion and Rodriguez continued to solicit pool participants in TTT using their investment strategy as a selling point despite the fact that they knew, or were reckless in not knowing, that the strategy could not support annual interest payments of 18 to 24%.

76. For example, between on or about October 25, 2021, and January 31, 2022, the TTT Pool received roughly $1.235 million in loans from 10 different pool participants. Each of these individuals invested money with TTT pursuant to a promise from TTT to return monthly interest payments at an 18% annualized rate.

77. However, from the start of the Relevant Period through the end of October 2021, TTT had lost approximately $2.27 million of pool participants' funds trading retail forex on leverage in the TTT Offshore Account and over $873,000 of pool participants' funds trading retail forex on leverage in the TTT Brokerage Account.

78. Defendants also failed to advise pool participants or potential participants that they were not registered with the CFTC, as required.

79. Thus, Defendants knew or were reckless in not knowing that their representations and omissions to pool participants regarding their experience, track record, and registration status were false or misleading.

      *b.*    *Misrepresentations About Investment Strategy*

80. Defendants Carrion and Rodriguez sent many potential pool participants a PowerPoint presentation, purporting to explain TTT's trading. The presentation explained that

TTT would invest Participant-1's funds in "the forex market," along with some additional markets of "cryptocurrency," "commodities," and "index's [*sic*]." The presentation contained misrepresentations regarding Defendants trading strategy, which Defendants often repeated when soliciting pool participants.

81.     The presentation highlighted "our secret ingredient to our success: Limiting the risk by using a 1% loss to 3% gain ratio based on our tested strategy."

82.     Participant-1 understood, for example, based on conversations with Defendant Rodriguez, that this strategy meant that TTT would risk at most 1% of the TTT Pool's principal with the goal of trading to make 3% profit. Defendant Rodriguez told Participant-1 that he made enough from this strategy to cover the next three years of interest payments.

83.     Defendants also misrepresented to pool participants the length of time that TTT would hold investments open. For example, Rodriguez told Participant-2 that his successful retail forex trading strategy involved using 1% of equity to make 3% profit, and then closing the position, which would not be held longer than intraday. Rodriguez told pool participants that because the TTT Pool would remain liquid TTT would always be able to return the loan principal on demand, as permitted under the terms of the promissory notes.

84.     In fact, TTT regularly held its positions open for days or weeks at a time, eliminating the liquidity that was touted to participants as a benefit of investing with TTT. In fact, in or about April 2022, Participant-1 demanded the return of his loan principal and Defendant Carrion told him that returning the funds was impossible because they were tied up in long-term trades. In fact, TTT had already lost Participant-1's money trading retail forex on leverage.

85.     Rodriguez solicited Participant-3 to invest money with him, and told Participant-3 that his strategy was to risk 1% of his money to make 3% profit.  Rodriguez told Participant-3 that pool participants would always be able to get her principal back in the event of poor investment returns because the loan principal would be kept untouched in a "reserve fund."

86.     As alleged above, on information and belief, TTT did not maintain a reserve fund at all.  Moreover, TTT's trading records show that Defendants often entered leveraged trades that required them the post significantly more than 1% of the TTT Pool's total assets.  And because the trades were leveraged, the risk of loss from these trades was far greater than the amount paid to enter them.

c.     *Misrepresentations About Security of the Investments*

87.     TTT's presentation also listed "Collateral" for potential pool participants' loans to TTT.  TTT's presentation referenced the following: "Promissory Note"; a "Guarantee against Technical [T]rading [T]eam assets.  Sponsors have 1 million and reserve account with 2.5 million."

88.     In phone conversations with Participant-2, for example, Rodriguez said that TTT would always hold a reserve fund made up of Participant-2's loan that the principals of TTT would not use for investing.  Rodriguez told Participant-2 on a phone call that the TTT Pool at that time held $2.3 million in outside funds and $1.5 million of Rodriguez and Carrion's money.

89.     In fact, nearly all of the assets held by TTT had been sent to TTT by other pool participants, and thus were the subject of other participants' promissory notes, and thus subject to the rights and obligations provided in those notes and in the Guaranties signed along with those notes.  Although Defendants contributed some of their own funds to the TTT Pool, those funds were far less than what the Defendants would owe pool participants in the event of default under the terms of the promissory notes.

90.     On or about April 28, 2021, Participant-2 emailed Defendant Carrion about the security of his potential investment in the TTT Fund.  Participant-2 wrote that he had the understanding from Defendant Rodriguez that "a multifamily building in Miami [would be] used as collateral in case the deal went south," but "on the Promissory Note under Section 5 for Security the building is not listed" where the TTT presentation had "indicate[d] a guarantee against Technical Trading's assets."

91.     Defendant Carrion assured Participant-2 in a response email that "we pledge as collateral all the assets of Technical Trading Team" and further that he "told our lenders . . . that we will pledge all the assets of TTT as a guarantee."  He further represented that "we provide our lenders a Confession of [J]udgement Affidavit, allowing you to bypass any court and go directly after our personal assets in the event we default."

92.     On or about April 29, 2021, Defendant Rodriguez also reached out to Participant-2 over text message regarding Participant-2's emails with Defendant Carrion.  Defendant Rodriguez explained over text message that he and Defendant Carrion "guarantee everything and you can put a lien on all our assets as well as the fund itself.  [W]e have a piece of property that him and I own together that will cover the entire fund and more god forbid anything ever goes south."  Defendant Rodriguez added that "Me and my partner created a reserve fund to cover ourselves on top of our personal assets which is what's listed on the actual legal contract."

93.     Participant-1 also understood from representations by Rodriguez that TTT's assets included a trucking company and real estate located in Miami.  Upon information and belief, TTT never owned either such assets, nor did TTT have a reserve fund separate and apart from the funds provided by pool participants.

    *d. Misrepresentations About Registration with Financial Regulators*

94. Defendant Rodriguez made misrepresentations to pool participants about whether TTT needed to be registered with any financial regulator.

95. For example, when soliciting Participant-2 to invest his money with TTT, Defendant Rodriguez told Participant-2 that his loan to TTT would not have to be registered with the State of Florida or the SEC.  Defendant Rodriguez made the same representation to Participant-1.

96. Later, Participant-2 asked Defendant Rodriguez about how TTT's purported "reserve fund" was described in the promissory note for his potential investment.  Defendant Rodriguez responded that "we can't say that because reserves are not per SEC regulations so we have there [*sic*] to cover ourselves.  The regulations with the SEC is where if this goes to zero we have to pay our investors or me and my partner go to jail.  Me and my partner created a reserve fund to cover ourselves on top of our personal assets which is what's listed on the actual legal contract.  For us to add that it would have to go back to our lawyers and it becomes a whole big legal thing to see if we can even add it or not."  On information and belief, TTT simply did not maintain a reserve fund.

97. When opening the TTT Brokerage Account, the account opening forms asked TTT whether it was "subject to regulation by any federal, state, or local regulatory authority." The box marked "no" was checked.  Defendants Carrion and Rodriguez both signed the form.

98. In fact, neither TTT, the TTT Pool, nor Defendants Carrion or Rodriguez were ever registered with the Commission, nor with the Securities and Exchange Commission. Defendants did not tell pool participants or potential participants that in fact the TTT Pool was a commodity pool and TTT a commodity pool operator, and that none of the Defendants had registered with the Commission as CPOs or Associated Persons of the CPO.

99.     Each of these representations and omissions was material to pool participants and potential participants in making their decision whether to invest their money with TTT.

C.    **Pool Participants' Investments in the TTT Pool**

100.    Based on these representations, Participant-1 invested a total of $700,000 in the TTT Pool by executing a series of promissory notes: the first on or about August 8, 2020, for $100,000, at 24% interest; the second on or about September 15, 2020, for an additional $100,000 at 24% interest; the third on or about March 15, 2021, for an additional $300,000 at 24% interest; the fourth on or about September 1, 2021, for an additional $100,000 at 18%; and the last on or about November 18, 2021, for an additional $100,000 at 18% interest.

101.    The promissory notes were signed at various times by Defendant Rodriguez and by Defendant Carrion on behalf of TTT.

102.    Under the terms of the note, Participant-1 would receive monthly interest payments at an annual rate of 24% or 18%, depending on the note, compounded daily, for a term of one year.  After one year, Participant-1's loan would mature and the balance of the principal was to be returned.

103.    In the event of TTT's default, defined as including TTT's "failure . . . to make any payment of interest or principal hereunder when the same is due and payable," Participant-1 had a contractual remedy "to declare the entire unpaid amount of the Liabilities immediately due and payable in full."  Further, TTT would be required to pay an additional 5% interest above the interest rate under the note, *i.e.*, 23% interest in total, until the maturity date until the default is cured.

104.    Collateral for the loan was listed on the promissory note as "all of the assets of the Borrower."  Defendants Rodriguez and Carrion also executed on behalf of TTT a Guaranty and Suretyship Agreement with Participant-1 on or about November 18, 2021.  Under the agreement,

TTT acted as a guarantor of the promissory note "for the full, prompt and complete payment of the indebtedness, liabilities and obligations owing by the Borrower to the Lender evidenced by the Note."  Participant-1 wired his funds to the TTT Bank Account.

105.    In light of Defendants' misrepresentations regarding the safety of a potential investment in the TTT Pool, Participant-2 invested $250,000 in the TTT Pool on or about April 28, 2021.  To carry out this investment, Participant-2 and Defendant Carrion, signing as CEO of TTT, executed a promissory note under which Participant-2 would receive monthly interest payments at an annual rate of 18% for a term of one year, at which time the loan would mature and the balance of the principal would be returned.

106.    To complete the investment in the TTT Pool, on or about April 30, 2021, Participant-2 wired $250,000 from his bank account to the TTT Bank Account, following the wire instructions provided to him by Defendant Carrion.

107.    Participant-2 considered making a second investment in the TTT Pool in or around October 2021, and this time recruited additional individuals to invest alongside him. Before investing, on or about October 25, 2021, Participant-2 emailed Defendant Rodriguez again about the security of the potential investment, asking, "what are the Technical Trading Team's assets that the investors have a guarantee against?  That is what we have to show them to make them comfortable.  Is it cash, buildings, houses, deposit account with SEC etc???  That is all anyone cares about."

108.    Defendant Carrion replied to Participant-2's email: "Here is your answer in an easy peasy way.  Technical Trading Teams assets are: all the money we have in the operating bank account at [Bank 1] and also all the assets that we have in all the brokerage accounts."

109.    Based on these representations, Participant-2 invested an additional $200,000 in the TTT Fund on or about January 14, 2022, pursuant to a second promissory note providing for 18% annual interest, and signed on behalf of TTT by Defendant Rodriguez.

110.    Likewise, between on or about October 25, 2021, and January 31, 2022, the TTT Pool received roughly $1.235 million in loans from 10 different pool participants.

111.    Based on these same representations, Participant-3 invested in TTT for the first time on or about August 24, 2020, agreeing to a promissory note for a loan of $250,000 to TTT at 18% interest.  The promissory note was signed on behalf of TTT by Defendant Carrion.

112.    Participant-3 invested in the TTT Pool an additional five times for a total of $1 million in loans to TTT.  Each time, Defendant Carrion emailed Participant-3 a new promissory note that extended the term of the loan for one year.

113.    All told, the TTT Pool received wires from approximately twenty-seven pool participants totaling roughly $5 million.

**D.    <u>Defendants' Default on Interest Payments</u>**

114.    For certain months, TTT was able to provide the returns promised to pool participants in accordance with their interests in the TTT Pool.  Defendants' retail forex trading of pool participant money in the TTT Pool was extremely unprofitable, however, and Defendants notified certain pool participants of a default beginning in or about October 2022.

115.    Trading records show that in 2021, Defendants' trading of retail forex in the TTT Brokerage Account resulted in a net loss of over $101,000.  Defendants' retail forex trading in 2022 resulted in a loss of nearly $900,000, plus they paid nearly $30,000 in interest for trading retail forex on margin.

116.    Defendants stopped trading retail forex in the TTT Brokerage Account in or about August 2022, withdrawing the $50,000 that remained in the TTT Brokerage Account on or about August 12, 2022.

117.    In sum, starting in or around April 2020, Defendants deposited over $1.75 million of pool participants' money in the TTT Brokerage Account.  Over the course of the ensuing two years, until the TTT Brokerage Account was emptied in August 2022, Defendants lost approximately $874,000—roughly half of participant money sent to the TTT Brokerage Account—by trading retail forex on margin.

118.    Trading in the TTT Offshore Account was similarly unprofitable.  Records regarding the TTT Offshore Account show that TTT lost approximately $21,250 trading retail forex on margin in 2020, then lost nearly $1.85 million in 2021, and approximately $337,000 in 2022.

119.    In sum, starting in or around September 2020, Defendants deposited approximately $3 million of pool participants' money into the TTT Offshore Account.  Trading retail forex on margin over the ensuing two years, TTT lost approximately $2.27 million of participants' money, approximately 75% of the money Defendants sent to the TTT Offshore account.

120.    During the Relevant Period, Defendants withdrew approximately $760,000 from the TTT Offshore account, including $246,722 on or about June 14, 2022.  On or about August 19, 2022, Defendants closed out a leveraged retail forex position that resulted in a loss of over $685,000, and stopped trading in the account a week later.  By August 2022, the TTT Offshore Account was virtually empty.

121.     On or about October 11, 2022, Defendants provided a notice that they were defaulting on repaying the loans from their pool participants.  On or about that date, Defendants Carrion and Rodriguez emailed from Carrion's email address to certain pool participants in the TTT Pool: "Please be advised that as a result of significant trading losses we are unable to make the interest payments for October and the foreseeable future."  They added, "Given the circumstances, we are no longer borrowing funds from third parties."

122.     In or about February 2023, Defendants informed a second set of pool participants that they had defaulted on their interest payments.  Defendant Carrion emailed participants and told them that TTT would not be making further interest payments because TTT was under investigation by the Securities and Exchange Commission and a court had frozen TTT's assets. No such investigation was underway nor was any court order in effect at or since that time. Further, Defendant Carrion did not mention in the email that TTT had lost millions of participants' money and that TTT had essentially no assets remaining.

123.     Despite Defendants' material representations to keep the corpus of the over $5 million in pool participants' money in a reserve fund, and only invest 1% at a time in intraday trades, as of November 30, 2022, the TTT Bank Account held a balance of $14,808, the TTT Brokerage Account and the TTT Offshore Account were empty or held a nominal amount of money.

124.     Neither Participant-1, Participant-2, Participant-3, nor any of the other participants in the TTT Pool has received the guaranteed returns, denominated by TTT as "interest" payments, from TTT since that date.

125.    Defendants made the misrepresentations and omissions alleged herein knowingly or with reckless disregard for the truth, and by use of the wires or other means or instrumentalities of interstate commerce.

**E.    Defendants' Misappropriation of Pool Participant Funds**

126.    Defendants misappropriated pool participants' funds in order to pay interest to later participants, in the manner of a Ponzi scheme.

127.    Furthermore, Defendants misappropriated pool participants' funds for their own personal use.  For example, in or about August 2021, TTT wired approximately $150,000 from the TTT Bank Account to Yacht Zero LLC, a company that specializes in brokering sales of yachts.

128.    The TTT Bank Account made multiple wire transfers and checks to Rodriguez and Carrion personally over the Relevant Period, totaling approximately $138,694 and $37,551, respectively.  Over the Relevant Period, Carrion and Rodriguez regularly flaunted their possession of luxury cars and their international travels both in person and in their social media accounts.

**F.    Defendants' Misrepresentations to Conceal Their Fraudulent Activity**

129.    After Defendants had lost millions of dollars of pool participants' money through their trading of retail forex on leverage, Defendants repeatedly misrepresented to participants TTT's ability to repay pool participants' loans.

130.    First, both Defendant Carrion and Defendant Rodriguez told pool participants that they would be able to recoup their losses when they finished creating a "bot" that used machine-learning-based artificial intelligence that could manage the TTT Pool's money.  This purported bot was distinct from pre-programmed algorithmic trading that Defendants also represented to pool participants TTT had been using.

131.    In or about April 2022, for example, Participant-1 asked TTT to return the principal of his loans to TTT, and to confirm that TTT was not in default and that "the fund currently holds assets equal to or more than it has been provided [*sic*] as an investment and that it's [*sic*] position has not materially and adversely changed."  Defendant Carrion told Participant-1 that TTT could not return the principal because the funds were tied up in long-term risk positions, contrary to Defendants' representations when soliciting Participant-1's funds that TTT would engage only in intraday trades.  In fact, by April 2022 TTT had already lost $2.6 million of pool participants' money—or 61% of what pool participants had invested in the TTT Pool—by trading retail forex on margin.

132.    Instead of informing Participant-1 that TTT had lost his money trading, Defendant Carrion, in response to Participant-1's question whether TTT held sufficient assets to pay back its pool participants, assured him that "[o]ur financial position has not changed as payments are provided to all of our lenders in a timely manner specific to each individual contract size sent out on a monthly basis."

133.    In or about April 2022, Defendant Rodriguez told Participant-1 that TTT's AI-based software would be available to trade TTT Pool's money within 8 to 12 weeks, and that TTT's goal was to use AI-based management for all of TTT's trading of Participant-1's money. At that time, TTT's balance in all of its accounts was approximately $790,000, only 13% more than the $700,000 that Participant-1 alone had loaned to TTT.

134.    TTT continued to tout its supposed AI-based investment strategy in October 2022 when it sent certain pool participants a notice of default.  In the notice of default, Defendant Carrion wrote pool participants that TTT's plan to recover participants' money was to license its

AI-based trading software to others in the financial industry and repay participants with those fees, while also allowing participants to trade using the algorithm themselves.

135.    On information and belief, no pool participant has been repaid using fees from licensing software, nor have pool participants personally benefitted from trading using TTT's purported AI-based software.

136.    Defendants also misrepresented to certain participants that TTT was unable to repay their loans because the Securities and Exchange Commission had instituted an action against TTT for failing to comply with SEC regulations and, as a result of that action, a court in Florida had issued an order freezing TTT's assets.

137.    In or about February 2023, by which time TTT had stopped trading retail forex in its Brokerage Account or Offshore Account due to millions of dollars in trading losses, Defendant Carrion told certain pool participants that in fact the court-ordered freeze would continue through in or about May 2023 while the court reviewed every financial transaction made by TTT.

138.    In or about May 2023, Defendant Rodriguez told pool participants that TTT's lawyers now anticipated a resolution of the case in or around September 2023, and that TTT would be able to repay participants then.

139.    The SEC has not instituted any actions against TTT, either for failing to comply with SEC regulations or for any other violations, and therefore no court has issued an order freezing TTT's assets in the nonexistent action.

**G.    Technical Trading Team Acted as an Unregistered CPO, and Carrion and Rodriguez Acted as Unregistered APs of a CPO**

140.    During the Relevant Period, Defendant Technical Trading Team, through Defendants Carrion and Rodriguez, acted by operating, or soliciting funds, securities, or property

from individuals who were not ECPs to participate in a retail forex pool that was not an ECP and that engaged in retail forex trading.

141.     During the Relevant Period, Carrion and Rodriguez acted in a capacity requiring registration as an AP of a CPO by soliciting pool participants and potential participants for participation in the TTT Pool, while associated with Technical Trading Team as a member, officer, employee, or similar agent.

142.     During the Relevant Period, Technical Trading Team was not registered with the Commission as a CPO, and neither Carrion nor Rodriguez was registered with the Commission as an AP of a CPO as required by the Act and Regulations.

**H.     Carrion and Rodriguez Were Controlling Persons of Technical Trading Team**

143.     Carrion was the CEO of TTT and was responsible for the business operations of TTT.

144.     Rodriguez was the COO of TTT, and held himself out as being in charge of trading the assets of the TTT Pool.  Rodriguez was an authorized member of TTT.

145.     Defendants Rodriguez and Carrion were each 50% owners of Defendant Technical Trading Team, LLC.

146.     Both Carrion and Rodriguez provided pool participants with information regarding the TTT Pool and status of their loans to the TTT Pool.  Both Carrion and Rodriguez had signatory power over the TTT Bank Account, into which pool participants wired their loans pursuant to the promissory notes signed with TTT, and over the TTT Brokerage Account and TTT Offshore Account, and both Carrion and Rodriguez at various times signed various pool participants' promissory notes on behalf of TTT.

147.     Thus, Defendants Carrion and Rodriguez were direct or indirect controlling persons of Technical Trading Team.

I.    **Carrion and Rodriguez Acted as Agents for Technical Trading Team**

148.    Through their solicitation of prospective and existing pool participants and their

continued communication with participants regarding the status of their loans to the TTT Pool, as

well as their trading of the assets of the TTT Pool and operation of the business of TTT, Carrion

and Rodriguez acted as agents of Technical Trading Team.

## VI.    **VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS**

### **COUNT ONE—AGAINST ALL DEFENDANTS**

**Violations of Section 4b(a)(2)(A)–(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)–(C), and Regulation 5.2(b)(1)–(3), 17 C.F.R. § 5.2(b)(1)–(3) (2022)**
**(Fraud In Connection with Retail Forex Transactions by Fraudulent Solicitation and Misappropriation)**

149.    Paragraphs 1 through 148 are re-alleged and incorporated herein by reference.

150.    Section 4b(a)(2)(A)–(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)–(C), makes it

unlawful "for any person, in or in connection with any order to make, or the making of, any

contract for sale of any commodity for future delivery . . . that is made, or to be made, for or on

behalf of, or with, any other person, other than on or subject to the rules of a designated contract

market—(A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to

make or cause to be made to the other person any false report or statement or willfully to enter or

cause to be entered for the other person any false record; or (C) willfully to deceive or attempt to

deceive the other person by any means whatsoever in regard to any order or contract or the

disposition or execution of any order or contract, or in regard to any act of agency performed,

with respect to an order or contract for or, in the case of paragraph (2), with the other person."

151.    Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), in part, makes

such retail forex agreements, contracts or transactions "subject to" Section 4b of the Act,

7 U.S.C. § 6b, and thus 7 U.S.C. § 6b(a)(2)(A)–(C).  Additionally, Section 2(c)(2)(C)(iv) of the

Act, 7 U.S.C. § 2(c)(2)(C)(iv), in part, provides that 7 U.S.C. § 6b, and thus 7 U.S.C.

§ 6b(a)(2)(A)–(C), also applies to the retail forex transactions, agreements, or contracts offered

by Defendants "as if" they were a contract of sale of a commodity for future delivery.

152.   Regulation 5.2(b)(1)–(3), 17 C.F.R. § 5.2(b)(1)–(3) (2022), makes it unlawful "for

any person, by use of the mails or by any means or instrumentality of interstate commerce,

directly or indirectly, in or in connection with any retail forex transaction:  (1) [t]o cheat or

defraud or attempt to cheat or defraud any person; (2) [w]illfully to make or cause to be made to

any person any false report or statement or cause to be entered for any person any false record; or

(3) [w]illfully to deceive or attempt to deceive any person by any means whatsoever."

153.   During the Relevant Period, Defendants violated 7 U.S.C. § 6b(a)(2)(A)–(C) and

17 C.F.R. § 5.2(b)(1)–(3), by, among other things, making misrepresentations to non-ECPs in

off-exchange foreign currency transactions offered on a leveraged or margined basis, or financed

by the offeror, counterparty, or person acting in concert with the offeror or counterparty, via

instrumentalities of interstate commerce, including misrepresentations such as:

a.   Falsely representing to pool participants and potential participants the scope of

their experience and the success of their track record, specifically by knowingly

misrepresenting that past trades made on demonstration software were not

actually made with real money and knowingly misrepresenting the profitability of

the trading strategy;

b.   Falsely telling pool participants that they would invest no more than 1% of the

TTT Pool at a time, and that the investments would not be held overnight so that

their investments would remain liquid, when in fact Defendants repeatedly

33

entered trades that invested more than 1% of the TTT Pool's assets and held such

trades open for days, sometimes weeks or months at a time;

c.   Falsely telling pool participants that their loans would remain in a reserve fund

that would not be risked in the market, when in fact Defendants did not maintain a

reserve fund and invested and repeatedly put participants' principal at risk in

leveraged retail forex trades; and

d.   Misrepresenting the scope of TTT's assets that were available to serve as

collateral for pool participants' loans, specifically by falsely representing that

TTT held real estate that could serve as collateral, and by representing that TTT

had funds that could serve as collateral when it did not hold significant assets

apart from the money loaned to it by pool participants.

154.   During the Relevant Period, Defendants further violated 7 U.S.C. § 6b(a)(2)(A)–

(C) and 17 C.F.R. § 5.2(b)(1)–(3), by, among other things, omitting to disclose to pool

participants that:

a.   Defendants suffered substantial trading losses in the TTT Brokerage

account, despite direct questions from pool participants as to the safety of

their loans and the solvency of TTT;

b.   Defendants were not registered with the Commission as required by the

Act and Commission Regulations, despite making assurances to pool

participants that the TTT's investment structure was created in accordance

with Securities and Exchange Commission regulations; and

c.   In responding to a pool participant question whether TTT had sufficient

assets to repay its pool participants in April 2022, Defendant Carrion told

the participant that TTT's "financial position had not changed" despite the fact that it had already lost millions of pool participants' money trading retail forex on leverage.

155.    During the Relevant Period, Defendants further violated 7 U.S.C. § 6b(a)(2)(A)–(C) and 17 C.F.R. § 5.2(b)(1)–(3), by, among other things, misappropriating pool participants' funds for personal use, such as by wiring $150,000 to a third party for purposes of obtaining a yacht.

156.    Defendants committed the acts and practices described above using instrumentalities of interstate commerce, including the use of interstate wires for transfer of funds.

157.    Defendants committed the acts and practices described herein willfully, or with reckless disregard for the truth.

158.    The foregoing acts, omissions and failures of Carrion and Rodriguez, and of all other agents of TTT, occurred and are occurring within the scope of their employment, office or agency with TTT; therefore, TTT is liable for these acts, omissions and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2022).

159.    Carrion and Rodriguez directly or indirectly control TTT, and did not act in good faith or knowingly induced, directly or indirectly, TTT's violations alleged in this Count, and thus are liable for TTT's violations pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

160.    Each act of misrepresentation, omission of material fact, and misappropriation, including, but not limited to, those specifically alleged herein, constitutes a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A)–(C) and 17 C.F.R. § 5.2(b)(1)–(3).

## COUNT TWO—AGAINST ALL DEFENDANTS

### Violations of Section 4*o*(1)(A) of the Act, 7 U.S.C. § 6*o*(1)(A)
### (Fraud by a CPO and an Associated Person of a CPO)

161.    Paragraphs 1 through 160 are re-alleged and incorporated herein by reference.

162.    7 U.S.C. § 6*o*(1)(A) makes it unlawful for CPOs and APs of CPOs

> [B]y use of the mails or any other means or instrumentality of interstate commerce, directly or indirectly – (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant. or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

163.    Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), in part, makes such retail forex agreements, contracts or transactions, and pooled investment vehicles described in Section 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii), "subject to" 7 U.S.C. § 6*o*.

164.    As alleged herein, during the Relevant Period, Technical Trading Team, through Carrion and Rodriguez, acted as a CPO by operating, and by soliciting and accepting funds, securities, or property for a commodity pool for the purpose of trading commodity interests, including retail forex.

165.    Carrion and Rodriguez each acted as APs of a CPO by associating with TTT, a CPO, as a partner, officer, employee, consultant, or agent in a capacity which involved the solicitation of funds, securities, or property for participation in a commodity pool.

166.    TTT, through Carrion and Rodriguez, and Carrion and Rodriguez in their individual capacities, violated 7 U.S.C. § 6*o*(1)(A), in that by use of the mails and internet in sending checks to pool participants for interest on their loans, and other means or instrumentality of interstate commerce including emailing documents and texting information containing

misrepresentations, they employed or are employing a device, scheme, or artifice to defraud actual or prospective pool participants.

167.    During the Relevant Period, Defendants violated 7 U.S.C. § 6*o*(1)(A) by, among other things:

> a.    Falsely representing to pool participants and potential participants the scope of their experience and the success of their track record;
>
> b.    Falsely telling pool participants that they would invest no more than 1% of the TTT Pool at a time, and that the investments would be short term so that their investments would remain liquid;
>
> c.    Falsely telling pool participants that their loans would remain in a reserve fund that would not be risked in the market;
>
> d.    Misrepresenting the scope of TTT's assets that would serve as collateral for pool participants' loans; and
>
> e.    Misappropriating pool participants' funds for personal use, specifically by wiring $150,000 to a third party for purposes of obtaining a yacht.

168.    Carrion and Rodriguez directly or indirectly control TTT, and did not act in good faith or knowingly induced, directly or indirectly, TTT's violations alleged in this Count, and are thus liable for TTT's violations pursuant to 7 U.S.C. § 13c(b).

169.    The foregoing acts, omissions and failures of Carrion and Rodriguez as alleged in this Count, occurred and are occurring within the scope of their employment, office, or agency with TTT; therefore, TTT is liable for these acts, omissions and failures pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

170.     Each misrepresentation, omission of material fact, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A).

### COUNT THREE—AGAINST ALL DEFENDANTS

### Violations of Section 4*o*(1)(B) of the Act, 7 U.S.C. § 6*o*(1)(B)
**(Non-Scienter Fraud by a CPO and an Associated Person of a CPO)**

171.     Paragraphs 1 through 170 are re-alleged and incorporated herein by reference.

172.     7 U.S.C. § 6*o*(1)(B) makes it unlawful for CPOs and APs of CPOs

[B]y use of the mails or any other means or instrumentality of interstate commerce, directly or indirectly—

* * *

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

173.     Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), in part, makes such retail forex agreements, contracts or transactions, and pooled investment vehicles described in Section 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii), "subject to" 7 U.S.C. § 6*o*.

174.     As alleged herein, during the Relevant Period, Technical Trading Team, through Carrion and Rodriguez, acted as a CPO by operating, soliciting and accepting funds, securities, or property for a commodity pool for the purpose of trading retail forex.

175.     Carrion and Rodriguez acted as APs of a CPO by associating with TTT, a CPO, as partners, officers, employees, consultants, or agents in a capacity which involved the solicitation of funds, securities, or property for participation in a commodity pool.

176.     TTT, through Carrion and Rodriguez, and Carrion and Rodriguez in their individual capacities, violated 7 U.S.C. § 6*o*(1)(B) in that by use of the mails and internet in

sending checks to pool participants for interest on their loans, and other means or instrumentality of interstate commerce including emailing documents and texting information containing misrepresentations, engaged or are engaging in transactions, practices, or a course of business which operated or operates as a fraud or deceit upon actual or prospective pool participants.

177.    During the Relevant Period, Defendants violated 7 U.S.C. § 6*o*(1)(B) by, among other things:

      a.    Falsely representing to pool participants and potential participants the scope of their experience and the success of their track record;

      b.    Falsely telling pool participants that they would invest no more than 1% of the TTT Pool at a time, and that the investments would be short term so that their investments would remain liquid;

      c.    Falsely telling pool participants that their loans would remain in a reserve fund that would not be risked in the market; and

      d.    Misrepresenting the scope of TTT's assets that would serve as collateral for pool participants' loans.

      e.    Misappropriating pool participants' funds for personal use, specifically by wiring $150,000 to a third party for purposes of obtaining a yacht.

178.    Carrion and Rodriguez directly or indirectly control TTT, and did not act in good faith or knowingly induced, directly or indirectly, TTT's violations alleged in this Count, and are thus liable for TTT's violations pursuant to 7 U.S.C. § 13c(b).

179.    The foregoing acts, omissions and failures of Carrion and Rodriguez as alleged in this Count occurred and are occurring within the scope of his employment, office or agency with

TTT; therefore, TTT is liable for these acts, omissions and failures pursuant to 7 U.S.C.

§ 2(a)(1)(B) and 17 C.F.R. § 1.2.

180.    Each misrepresentation, omission of material fact, and misappropriation,

including but not limited to those specifically alleged herein, is alleged as a separate and distinct

violation of 7 U.S.C. § 6*o*(1)(B).

### COUNT FOUR—AGAINST ALL DEFENDANTS

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1)
and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2022)
(Fraud by Deceptive Device or Contrivance)**

181.    Paragraphs 1 through 180 are re-alleged and incorporated herein by reference

182.    7 U.S.C. § 9(1) makes it unlawful, in relevant part, for any person, directly or

indirectly, to:

> [U]se or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] . . . .

183.    With certain exceptions not relevant here, Section § 2(c)(2)(C)(ii)(I) of the Act,

7 U.S.C. § 2(c)(2)(C)(ii)(I), in part, makes such retail forex agreements, contracts or transactions

"subject to" 7 U.S.C. § 9(1).

184.    17 C.F.R. § 180.1(a) provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

185.    During the Relevant Period, as described above, Defendants violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) in that they directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, intentionally or recklessly used or employed (or attempted to use or employ) a device, scheme, or artifice to defraud; made (or attempted to make) untrue or misleading statements of material fact or omitted to state a material fact necessary in order to make the statements made not untrue or misleading; and engaged (or attempted to engage) in transactions, practices, or courses of business that operated as a fraud or deceit on any person by, among other things:

a.    Falsely representing to pool participants and potential participants the scope of their experience and the success of their track record;

b.    Falsely telling pool participants that they would invest no more than 1% of the TTT Pool at a time, and that the investments would be short term so that their investments would remain liquid;

c.    Falsely telling pool participants that their loans would remain in a reserve fund that would not be risked in the market;

d.    Misrepresenting the scope of TTT's assets that would serve as collateral for pool participants' loans; and

e.     Misappropriating pool participants' funds for personal use, specifically by wiring $150,000 to a third party for purposes of obtaining a yacht.

186.   Each and every misrepresentation, omission, or misappropriation by Defendants, including but not limited to those specifically alleged herein, has been made intentionally or recklessly.

187.   Carrion and Rodriguez directly or indirectly control TTT, and did not act in good faith or knowingly induced, directly or indirectly, TTT's violations alleged in this Count, and are thus liable for TTT's violations pursuant to 7 U.S.C. § 13c(b).

188.   The foregoing acts, omissions, and failures of Carrion and Rodriguez as alleged in this Count, occurred and are occurring within the scope of their employment, office, or agency with TTT; therefore, TTT is liable for these acts, omissions and failures pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 .

189.   Each misrepresentation, omission of material fact, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

## COUNT FIVE—AGAINST ALL DEFENDANTS

### Violations of Sections 2(c)(2)(C)(iii)(I)(cc) and 4m(1) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2022) (Failure to Register as a Commodity Pool Operator)

190.   Paragraphs 1 through 189 are re-alleged and incorporated herein by reference.

191.   As alleged herein, during the Relevant Period, Defendant Technical Trading Team, which was not exempt from registration as a CPO, acted as a CPO and made use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO by operating or soliciting funds, securities, or property for a retail forex pool that is not an ECP and that engages in retail forex transactions.  TTT engaged in this conduct without being

registered with the Commission as a CPO in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc) and 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

192.    Commission Regulation 5.25, 17 C.F.R. § 5.25 (2022), provides that 7 U.S.C. § 6m, and thus 7 U.S.C. § 6m(1), of the Act applies to "retail forex transactions that are subject to the requirements" of Commission Regulation Part 5, which concerns off-exchange foreign currency transactions "as though [§ 6m] were set forth herein and included specific references to retail forex transactions."

193.    Carrion and Rodriguez directly or indirectly control TTT, and did not act in good faith or knowingly induced, directly or indirectly, TTT's violations alleged in this Count, and are thus liable for TTT's violations pursuant to 7 U.S.C. § 13c(b).

## COUNT SIX—AGAINST ALL DEFENDANTS

**Violations of Sections 2(c)(2)(C)(iii)(I)(cc) and 4k(2) of the Act, 7 U.S.C.**
**§§ 2(c)(2)(C)(iii)(I)(cc), 6k(2) , and Regulations 3.12(a) and 5.3(a)(2)(ii), 17 C.F.R.**
**§ 5.3(a)(2)(ii) (2022)**
**(Failure to Register as an Associated Person of a Commodity Pool Operator)**

194.    Paragraphs 1 through 193 are re-alleged and incorporated herein by reference.

195.    During the Relevant Period, Defendants Carrion and Rodriguez acted as Associated Persons of a CPO—Technical Trading Team—by operating or soliciting funds, securities, or property for the TTT pool, which was not an ECP, in connection with leveraged or margined retail forex transactions.

196.    Carrion and Rodriguez engaged in this conduct without being registered with the Commission as APs of CPO Technical Trading Team, in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc) and 6k(2) and 17 C.F.R. §§ 3.12(a) and 5.3(a)(2)(ii).

197.    Commission Regulation 5.25, 17 C.F.R. § 5.25 (2022), provides that 7 U.S.C. § 6k, and thus 7 U.S.C. § 6k(1), of the Act applies to "retail forex transactions that are subject to

the requirements" of Commission Regulation Part 5, which concerns off-exchange foreign

currency transactions "as though [§ 6k] were set forth herein and included specific references to

retail forex transactions."

198.     The foregoing acts, omissions, and failures of Carrion and Rodriguez as alleged in

this Count, occurred and are occurring within the scope of their employment, office, or agency

with TTT; therefore, Technical Trading Team is liable for these acts, omissions and failures

pursuant to Section 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

## COUNT SEVEN—AGAINST ALL DEFENDANTS

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1)
and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2022)
(Fraud by Deceptive Device or Contrivance)**

199.     Paragraphs 1 through 198 are re-alleged and incorporated herein by reference

200.     7 U.S.C. § 9(1) makes it unlawful, in relevant part, for any person, directly or

indirectly, to:

> [U]se or employ, or attempt to use or employ, in connection
> with any swap, or a contract of sale of any commodity in
> interstate commerce, or for future delivery on or subject to
> the rules of any registered entity, any manipulative or
> deceptive device or contrivance, in contravention of such
> rules and regulations as the Commission shall promulgate by
> not later than 1 year after [July 21, 2010, the date of
> enactment of the Dodd-Frank Wall Street Reform and
> Consumer Protection Act] . . . .

201.     With certain exceptions not relevant here, 7 U.S.C. § 2(c)(2)(C)(ii)(I), in part,

makes such retail forex agreements, contracts or transactions "subject to" 7 U.S.C. § 9(1).

202.     17 C.F.R. § 180.1(a) provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in
> connection with any swap, or contract of sale of any
> commodity in interstate commerce, or contract for future
> delivery on or subject to the rules of any registered entity, to
> intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

203.     During the Relevant Period, as described above, Defendants violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) in that they directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, intentionally or recklessly used or employed (or attempted to use or employ) a device, scheme, or artifice to defraud; made (or attempted to make) untrue or misleading statements of material fact or omitted to state a material fact necessary in order to make the statements made not untrue or misleading; and engaged (or attempted to engage) in transactions, practices, or courses of business that operated as a fraud or deceit on any person by, among other things:

a.     falsely representing to an RFED registered with the Commission that the source of the funds for the trading account came from earnings, savings and investments;

b.     falsely representing to an RFED registered with the Commission that it did not solicit, accept, or invest third party funds; and

c.     falsely representing to an RFED registered with the Commission that TTT was not a pooled asset entity.

204.     Each of these representations caused the RFED to do business in a manner inconsistent with its compliance obligations under Commission and NFA regulations, and therefore undermine the safety of CFTC markets.

205.     Each and every misrepresentation or omission by Defendants, including but not limited to those specifically alleged herein, has been made intentionally or recklessly.

206.     Carrion and Rodriguez directly or indirectly control TTT, and did not act in good faith or knowingly induced, directly or indirectly, TTT's violations alleged in this Count, and are thus liable for TTT's violations pursuant to 7 U.S.C. § 13c(b).

207.     The foregoing acts, omissions, and failures of Carrion and Rodriguez as alleged in this Count, occurred and are occurring within the scope of their employment, office, or agency with TTT; therefore, TTT is liable for these acts, omissions and failures pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

208.     Each misrepresentation and omission of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

## VII.   <u>RELIEF REQUESTED</u>

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.     Enter an order finding that Defendants Technical Trading Team, Carrion, and Rodriguez violated Sections 2(c)(2)(C)(iii)(I)(cc), 4b(a)(2)(A)–(C), 4k(2), 4m(1), 4*o*(1)(A)–(B), and 6(c)(1) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A)–(C), 6k(2), 6m(1), 6*o*(1)(A)–(B), 9(1), and Regulations 3.12(a), 5.2(b)(1)–(3), 5.3(a)(2)(i)–(ii), and 180.1(a)(1)–(3), 17 C.F.R. §§ 3.12(a), 5.2(b)(1)–(3), 5.3(a)(2)(i)–(ii), 180.1(a)(1)–(3) (2022).

B.     Enter an order of permanent injunction restraining, enjoining and prohibiting Defendants Carrion, Rodriguez, and Technical Trading Team, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons or entities in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A)–(C), 6k(2), 6m(1), 6o(1)(A)–(B), and 9(1), and 17 C.F.R. §§ 3.12(a), 5.2(b)(1)–(3), 5.3(a)(2)(i)–(ii), and 180.1(a)(1)–(3) (2022)..

C.     Enter an order of permanent injunction restraining, enjoining and prohibiting Defendants Technical Trading Team, Carrion, and Rodriguez, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons or entities in active concert with them, who receive actual notice of such order by personal service or otherwise, from, directly or indirectly:

1.     Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

2.     Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3.     Having any commodity interests traded on any Defendant's behalf;

4.     Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5.       Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6.       Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and

7.       Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022).

D.       Enter an order requiring Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment interest thereon from the date of such violations, plus post-judgment interest.

E.       Enter an order requiring Defendants, as well as any successors thereof, to make full restitution, pursuant to such procedure as the Court may order, to every person or entity who sustained losses proximately caused by Defendants' violations, including pre-judgment and post-judgment interest.

F.      Enter an order directing Defendants and any of their successors, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with or among Defendants and any of the clients whose funds were received by them as a result of the acts and practices which constituted violations of the Act and Regulations as described herein.

G.      Enter an order requiring each Defendant to pay a civil monetary penalty under the Act, to be assessed by the Court, in an amount not to exceed the penalty described by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, Tit. VII, § 701, 129 Stat. 584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the Act and Regulations, as described herein.

H.      Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2).

I.      Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated:  September 29, 2023          Respectfully submitted,

COMMODITY FUTURES TRADING COMMISSION

 /s/ *Peter Janowski*
Peter Janowski
Trial Attorney
pjanowski@cftc.gov

Diana Wang
Trial Attorney
dwang@cftc.gov

Patryk Chudy
Chief Trial Attorney
pchudy@cftc.gov

Manal Sultan
Deputy Director
msultan@cftc.gov

Commodity Futures Trading Commission
290 Broadway, 6th Floor
New York, New York 10007